BYERS et al. v. DANLEY.

RESULTING TRUSTS—*Nature of, etc.*—A resulting trust is a mere creature of equity, founded upon presumptive intention, and designed to carry that intention into effect.

*When will not attach, etc.*—It will not attach in the person paying the purchase money, if it was not the intention of either party that the estate should so vest in him.

AGENTS—*When purchase by, will not operate as a resulting trust.*—Where an authorized agent purchases land for his principal and advances the purchase money, not as a *loan to him* upon the security of the lands purchased, or for the purpose of converting the money into lands, but as an advance to the principal, to enable the agent to accomplish the object of his principal, no trust will result in favor of the agent.

SAME—*Liens of, for advances, etc.*—An agent has an implied or equitable lien, enforcible within proper time, in equity, for advances, expenses, commissions, etc., made in the purchase of lands for his principal, and this lien is incident to the debt and continues in the agent so long as he has the possession of the lands or title papers, but if he parts with the possession, or the debt be paid or barred by the statute of limitation, the lien is gone.

POSSESSION—*What must be, to operate in favor of holder.*—Possession, in order that the statute of limitations may operate in favor of the holder, must be adverse, intentional, actual, continuous and unbroken for the full period prescribed by the statute; if there be an interruption of holding, the term of adverse possession is closed, and upon resumption of possession, a new point is made from which limitations will again begin to run.

PARTITION—*When not cognizable in equity.*—Partition cannot be had in chancery when the lands asked to be divided are held adversely, or the title is in dispute, except in cases where the lands are unoccupied and there is only that possession in law, which is connected with the title to the lands.

APPEAL FROM WHITE COUNTY CIRCUIT COURT.

Hon. JOHN WHYTOCK, *Circuit Judge.*

*W. R. Coody* and *Rice & Benjamin* and *Whipple*, for Appellants.

*First,* We submit that no trust could result or be declared in favor of Smith; he invested the money as the agent of Northrop, and with the understanding that Northrop should pay it back.   17 *Miss.,* 228; 5 *Cush.,* 431; 1 *Md., chap.* 479; 2

*Paige*, 217; 1 *Dev. and Bat. (N. C.)*, 119; 6 *Ala.*, 404; 12 *Peters S. C.*, 241; 4 *Cranch., C. C.*, 541; 39 *Barbour*, 625; 10 *Vesey*, 366-7; 14 *Gray, Mass.*, 119 *and* 122 (*note*); 34 *Miss.*, 5 *George*, 611; 7 *B. Monroe, Ky.*, 433; 2 *Spence Equity Jurisdiction*, 204. Equity will not allow the intention of the parties to be frustrated by mistake or fraud, but will give the title its proper direction. *Smith's Leading Cases in Equity*, 562; 28 *Ala.*, 127; 3 *Iowa*, 422; 9 *Watt's*, 32; 1 *Story Equity*, sec. 54 *g.*; 1 *Paige*, 495; 2 *Wash. C. C.*, 321; 4 *Desau*, 487; 2 *Blackford*, 213, 8 *N. H.*, 195; 2 *Johnson, Chy.* 585.

*Second*, Smith, acting as agent, his act, in reference to the subject matter of the agency, was the act of Northrop. *Story on Agency*, sec. 2; 1 *Oregon Rep.* 272. Northrop paid the money, and Northrop received the deed; and there was no possible room for a resulting trust in favor of Smith. 3 *Sumner*, 466; 28 *Penn.* 419; 30 *Ib* 133; 58 *Ala.* 127; 17 *Ill.*, 623; 18 *Penn.*, 283; 13 *Ill.*, 221-7; 2 *Black U. S.*, 613; 23 *Cal.*, 51; 21 *Ark.*, 539; 18 *Ind.*, 462; 39 *Penn.*, 369; 2 *Md. Chy.*, 515; 2 *Washburn on Real Property*, 102 *and* 166; 1 *Barbour*, 180. In order to create a resulting trust in favor of him who pays the purchase money, the money must be paid *before* or *at the time of purchase*, and no future advance of the purchase money, after the trade is made, will be sufficient. In other words, "the trust must arise, if at all, out of the circumstance that the money of the real, and not of the nominal purchaser formed, *at the time of the purchase*, the consideration of that purchase, and was intended, *at the time*, by the party to be converted into land. 1 *Hoff. Chy.*, 90; 3 *Ala.*, 302; 13 *Iowa*, 521 *and* 540; 46 *Maine*, 311; 13 *Ill.*, 186, 221 *and* 227; 16 *Vermont*, 500; 3 *Md. Chy.*, 547; 32 *Penn.*, 371; 33 *Penn.*, 158; 3 *Miss.*, 190; 16 *Texas*, 214; 28 *Miss.*, 249; 2 *Wis.*, 552; 2 *Ind.*, 95; 2 *Johnson Chy.*, 405; 5 *Ill.*, 1 *to* 19; 6 *Cowen*, 706 *to* 725; 2 *Pope*, 218; 8 *N. H.*, 187; 2 *Fairfield, Me.*, 9; 16 *Maine*, 268; 6 *Dana*, 331; 3 *Wendell*, 638; 2 *Ark.*, 71; *Harrington Chy.*, 12, 130; 3 *Paige*, 390; 3 *Maine*, 41; 4 *Md.* 465.

*Third*, Smith had a lien, and only a lien, upon the title

papers and the lands·for his commissions, services, expenses, and advances, which grew out of his relation, and was incident to Northrop's indebtedness to him. *Story on Agency*, *sections 350 to 390 inclusive; 4 Ill.*, 94; *3 Story Equity, secs.* 1215 *to* 1217; *2 Kent*, 634; *Montague on Liens*, 1; *Smith's Mercantile Law*, 336-7, 514, 515; *2 Camp. Rep.*, 579.

*Fourth*, As to the Statute of Limitations, Northrop having the legal title, the constructive possession, by the payment of taxes, etc., followed the legal title, and he was in constructive possession until ousted by actual possession. 21 *Ark.*, 9; *Ib.*, 74; 1 *Hempstead, C. C.*, 225; 2 *Washburn on Real Property, top page* 484, *sec.* 8 *and* 9; 1· *Cowen*, 286; 6 *Serg. and R.*, 140. Then as to the actual possession of twelve acres of the lands, as alleged (but not proven) by Bond, in 1845, and continued until 1852. Before title can be acquired by possession, it must be adverse, actual, continuous and unbroken, for the full period prescribed by the statute; 22 *Ark.*, 78. Until the Act of the 4th of January, 1851, the period of limitation for real property, in this State, was ten years, (*English's Digest*, 98, *Section* 1), which Act of 1851 repealed the old Act of 1839; and by the second section, established the period of limitation as to lands at seven years, and the old statute bar of ten years, not having attached to Smith's actual· possession from 1845 until 1851, was operated upon by the new Act of limitation, as a demand in existance at the time of its passage, and gave· the parties interested, seven years after the passage of this new Act in which to bring their actions, unless the same was served by the provisions of the first section of the Act of 1851. 5 *Ark.*, 510; 6 *Ark.*, 513; *Gould's Digest, page* 748, *Section* 1 *and* 2.

The saving clause in the first section of the Act 4th of January, 1851, only applies to parties who had three years' possession of lands, etc., prior to the passage of the Act, "holding and claiming the same by virtue of a deed or deeds of conveyance, devise, grant or assurance." But if Smith had possession, it did not work a disseizin, or lay a proper founda-

tion for a title to become complete under the Statue of Limitation; for the title must be a fee or it amounts to nothing. 2 *Wash.* 498, *section* 18.

There must be an actual occupancy, clear, definite, positive, notorious and hostile. 6 *S. and R.*, 21; 9 *Penn.*, 226; 5 *Met.*, 15 *to* 33; 15 *Ill.*, 271; 5 *Md.*, 256; 20 *Howard*, 32; 15 *Pick*, 250; 2 *Geo.*, 191; 11 *Cush.*, 210; 10 *Johnson*, 477; 7 *Mass.*, 383; 11 *Penn.* 189.

Causing lands to be surveyed, lines marked, and occasionally cutting grass upon it is not sufficient. 4 *Mass.*, 216; 6 *Johnson*, 218; 2 *Rich.*, 627.

The occupancy must be manifested by fences or otherwise. 14 *Pick.*, 224; 10 *Barbour*, 254. Making sugar occasionally, in camp built on land, not sufficient. 1 *A. K. Marshall*, 207. Nor would a "lap," or "slash" fence around woodland be sufficient. 3 *Met.*, 125; 2 *Johnson*, 230; 10 *N. H.*, 397; 7 *N. H.*, 436. Cutting wood, clearing land, and running working lines, not sufficient. 6 *Cush.*, 129; 18 *Vt.*, 294; 1 *Allen*, 245.

The possession must be continued, adverse and exclusive, during the whole period prescribed by the statute. 20 *Howard*, 32; 13 *Pick.*, 250; 26 *Geo.* 191. The possession must be with the manifest intention to claim title to the land occupied against the true owner; in fact the intention with which the possession was commenced and continued are the only tests. 32 *Miss.*, 127; 30 *N. H.*, 355; 4 *Wheat*, 213; 6 *Ind.*, 273; 39 *N. H.*, 278 *and* 281; 9 *Johnson*, 180; 5 *Peters, U. S.*, 102; 8 *Cowen*, 589.

*Clark & Williams*, for Appellee.

We assume the position:

*First,* That when the deed of Creagh was first made and delivered to Austell & Marshall, it was an escrow, dependent for its effect as a deed, upon Smith's paying the one hundred and eighty dollars.

*Second,* That when that condition was complied with, the legal title passed to Northrop, and related back to the first

delivery against Creagh, and all parties claiming under him, except, perhaps, an attaching creditor, who might seize the land before the deed became absolute, as to which there is no question here. See *Hempstead vs. Johnson,* 18 *Ark.,* 125; 4 *Kent's Commentaries,* 155. We refer especially to the language of Judge Kent, as referred to in last reference. *McDowell vs. Cooper, et al.,* 14 *Sergeant & Rawle, Penn. Rep.* 296; *Harrison vs. Trustees of P. Academy,* 12 *Mass. Rep.* 460; *Canning and wife vs. Pinkham et al.,* 1 *New Hamp. Rep.* 353; *Buffon vs. Green,* 5 *New Hamp.* 71; *Goodrich vs. Wallace,* 1 *Johnson N. Y., Cases* 253; 4 *Kent,* 454, 456; *Shep. Touchstone,* 285.

The delivery of a deed to a third party is good, although the use is not declared. *Soverbye vs. Arden,* 1 *J. Ch. R.* 240. An actual delivery of the deed is not necessary to pass title. 1 *Edwards Chancery,* 497. When the grantor delivers the deed to a conveyancer, employed by the parties, to be deliverd to the grantee, the title passes immediately to grantee. *Reed vs. Mable,* 10 *Paige C. R.,* 409; *Byers vs. McClanahan,* 6 *Gill & J.* 250; *Tate vs. Tate,* 1 *Dev. & Bat. Ch.,* 22.

The naked legal title then vested in Northrop, charged with an equity in Smith for the payment of $313 00. This equity could be discharged by Northrop, by payment, within a reasonable time, and thus make his title good. That reasonable time did not extend beyond the period of ten years, which, by the law then in force, was ten years. See *English's Digest, Chap.* 99, *Sec.* 1; *Revised Statutes of* 1839, *Chap.* 91, *Sec.* 1; and was not repealed or altered until 1851, when the period was reduced to seven years, and Smith's possession, three years before, and Danley, claiming under him, three years thereafter, adversely to Northrop and his heirs, they are barred by the Act of 1851. *Gould's Digest, Chap.* 106, *Section* 1. When the Statute of Limitation commenced running against Northrop in 1840, it did not cease at his death, even in favor of minor heirs, for disabilities are not cumulative, and his heirs took, subject to the same rules and laws that Northrop held under. See *Carter vs. Cantrell,* 16 *Ark.,* 154;

6

*Brinkley vs. Willis,* 22 *Ark.,* 5; *Lytle vs. State,* 17 *Ark.,* 608. And Danley's possession can be added to Smith's to complete the bar. *Cunningham vs. Broomback,* 23 *Ark.,* 336.

We submit further, that Smith having furnished the purchase money, the legal title was vested in Northrop, with resulting trust in Smith.

Where a party purchases property and takes deeds in name of a third party, the latter is trustee of a satisfied trust, and his heirs cannot oust the former in ejectment. *Brown vs. Weast,* 7 *Howard Miss.,* 181; *Powell vs. Powell, Freeman's Chancery Miss. Rep.,* 134; *Methodist Episcopal vs. Jaques,* 1 *John. Chancery Rep.* 450; *Boyd vs. McLean,* 1 *Johnson Ch. Rep.,* 582; *Botsford vs. Burns,* 2 *Johnson Ch. Rep.,* 409; *Livingston vs. Livingston,* 2 *John. Ch. Rep.,* 540; 4 *English,* 518; *Cook vs. Bronaugh,* 13 *Ark.,* 187; *Cain vs. Leslie,* 15 *Ark.* 312; *Shields vs. Trammell,* 19 *Ark.,* 51; *Ferguson vs. Williamson,* 20 *Ark.,* 272.

The payment of a part of the purchase money of a tract of land raises a resulting trust in favor of the party by whom such payment is made. *Chadwick vs. Felt,* 35 *Penn. State R.,* 305; 16 *Texas,* 314.

Resulting trusts are not within the statute of Frauds. See above authorities. See *Rose's Digest,* 782; *Ib.* 366; *title Statute Frauds,* 15; and cases there cited.

A trust intended for the benefit of a third party, without his knowledge, may be affirmed by him afterwards. *Cumberland vs. Codington,* 3 *John. Ch. Rep.,* 261; *Shepherd vs. McEver,* 4 *John. Ch. Rep.,* 136.

Parol evidence is admissible to establish a *fact* from which the law will raise or imply a trust. *Moore vs. Moore,* 38 *New Hampshire,* 382.

Oral declarations are sufficient and competent to make out a trust by implication of law. 25 *Georgia,* 403; and the evidence of the trust may be circumstantial. 26 *Georgia,* 625; 29 *Geo.* 67.

On the same subject, see *Wells vs. Robinson,* 13 *California,*

133; 1 *Head* (Tenn.) 305; 2 *Ib.* 684; 12 *Indiana,* 348; 1 *Clark* (*Iowa*) 226; *Ib.* 271; *Ib.* 423.

Generally a constructive trust arises in favor of the one who furnishes money for the purchase of land. *Sullivan vs. McLemans,* 2 *Clark,* (*Iowa*) 437.

Where can we imagine a stronger state of facts to create an equity than we have here? It includes all three of the grounds of equitable interference. 1st, Fraud. 2d. Trust. 3d, Mistake. It was a fraud in Northrop to employ Smith to advance money and give his services under the agreement proved, and then abandon it. It was a trust because Smith advanced the money. It was a mistake to take the deed to Northrop instead of to himself.

BENNETT, J.—On the 2d day of April, 1858, Benjamin F. Danley, appellee, brought suit in equity, to quiet and perfect title and for the possession and rents, against appellants and others. Some of the defendants demurred to the bill; some failed entirely to defend in any form. Defendants, Cheek and Mays, regularly defended by answer and proofs, etc. Upon the hearing, a final decree was entered giving appellee possession of the lands, from which an appeal was taken.

The facts, as appears from the bill and records in this case, are substantially as follows:

On the 11th day of July, 1835, the lands in controversy, to-wit: S. W. ¼ of Section 10, Township 7 North, Range 7 West, were patented by the United States to Frederick Pace. On the 8th day of December, 1835, Pace sells to John G. Creagh and, on the 5th day of January, 1840, one Algernon S. Northrop, desiring to purchase said lands, and meeting with one Erastus Smith, at Little Rock, who was an attorney, and at that time upon an extensive tour in the south-west, employed said Smith, as his agent, to purchase said lands for him, provided he could find out the owner for the same, agreeing to give Smith one hundred dollars for his services, bear his necessary expenses, and pay back to him the purchase

money which he might have to advance upon the purchase of. said land. To all of which, Smith, at the time, agreed, and, for the purpose of consummating the purchase of said lands for Northrop, proceeded to Mobile, Alabama, where he was informed Pace, the original patentee, lived in Clark county of said State. Smith went immediately to see Pace, from whom he learned that he had, years before, sold the lands to Creagh; Smith then went back to Creagh; proposed to purchase said lands from him for Northrop. Smith purchased the lands for Northrop, as his agent, for one hundred and eighty dollars, but not being able to advance the purchase money, at the time, Creagh agreed to execute the deed to Northrop, and send the same to Aslett & Marshall, of Mobile, to be delivered to Smith, as the agent of Northrop, upon the payment of the purchase money. Two months after, to wit, on the 13th day of May, 1840, Smith was at Mobile and, as the agent of Northrop, secured the deed and title papers from Aslett & Marshall, and advanced, for Northrop, the purchase money. On the 15th of May, 1840, Smith sent deed and title papers to Goodrich & Boardman, at Little Rock, with his account, made out against Northrop, for his fees, expenses and purchase money advanced, with instructions to deliver the same to Northrop upon the payment of his account, amounting to three hundred and thirteen dollars. The bill then alleges title in Creagh; that the same passed to Northrop subject, of course, to Smith's equities for commissions and advances made by him, as the agent of Northrop; states that the papers remained with Goodrich & Boardman for a long time and were lost; that Smith learned that Northrop had abandoned the trade, etc. Smith took possession of the land in 1840; paid taxes until sale to Danley in 1851 or '52. In 1850, Northrop died intestate and without children. In 1852, Danley, knowing all the facts, purchased the lands from Smith for five hundred dollars. Smith makes a quit claim deed; Danley takes possession of the lands and had them surveyed off into town lots, etc.; held the same until 1855, adversely,

and until commencement of suit, so far as to pay taxes. In 1855 appellants, and those under whom they claim, took actual possession under an adverse title, exhibited in the bill. The bill then alleges constructive possession, by Smith, from 1840 until 1845 by payment of taxes, and then by agent Bond, until sold to appellee, in 1852. Twelve acres of the land were cleared; that Danley took possession, by his agent, in White county, who was known to appellants.

In 1853–4, Danley gave notice by advertisement and by agent, warning all persons not to trespass on said lands. On the 20th of April, 1852, Danley got a quit claim deed from Northrop's father; the brothers and sisters, except Thomas J., refusing to make a deed. Thomas J. gave Danley a quit claim deed dated 30th of December, 1857.

The bill then sets out Jones' deed from Creagh, on the 10th of May, 1855; Jones' deed to Cheek, of June 7, 1855; Sheriff's deed to Byers, January 1, 1856; Jones' deed to Heard, June 22, 1855; to Cheek, October 7, 1855; to Mays, October 20, 1855 (all recorded), and alleging them fraudulent and void; that appellants knew of his claim and took forcible possession of the lands. The bill then alleges perfect title to said lands both in law and equity, and by adverse holding from 1840 to 1855, and prays for decree for title, possession and cancellation of appellants' deeds; but if the proof is not sufficient to support his allegations as to title, that a decree be rendered declaring he has an estate during the life of Henry Northrop, with a fourth remainder in fee, and for the enforcement of Smith's lien for advances, commissions, etc., and for general relief. This bill was filed April 2, 1858.

July 5, 1858, appellee filed amended bill making certain persons parties to the bill, and decree pro confesso was entered up as to certain defendants.

January 1, 1859, defendants, except Cheek and Mays, files demurrer.

January 4, 1859, demurrer was overruled and defendants stood and decree pro confesso went against them. Cheek and

Mays filed answer to the bill denying the allegations to the same; setting up statute of frauds, and that they are innocent purchasers without notice, and stating their purchase from Pace, etc. After which the case was continued from time to time upon orders to take depositions, etc.; when, at the April term 1869, a final decree was entered against the appellants for the possession of the lands, and order of reference as to the rents and profits, etc.; to reverse which, the appellants prayed and obtained an appeal to this court.

The above statement of facts presents the following propositions for adjudication, viz:

*First.* Did the payment of the purchase money for the land by Smith, an agent, create a resulting or equitable trust in his favor, upon the failure of the principal to refund the money thus advanced, a deed having been executed in the name of the principal?

*Second.* Was the possession of the land by Smith, and Danley, his vendee, of such a nature, and held for such a length of time as ripened into a perfect title?

*Third.* Can partition be had, in chancery, when the property to be divided is held adversely, or when the title is in dispute?

Resulting trusts, or those which arise by implication of law, are specially excepted from the operation of the statute of frauds. *Gould's Digest, Sec.* 3, 549. Trusts of this sort were said by Lord Hardwick, in *Lloyd vs. Spillet,* 2 *Atk.,* 148, to arise in three cases: *First,* When an estate is purchased in the name of one person, but the money or consideration is given by another; *Secondly,* When a trust is declared only as to part and nothing said as to the rest, what remains undisposed of results to the heir at law, and they cannot be said to be trustees for the residue; and, *Third,* In cases of fraud and when transactions have been carried on *mala fide.*

Judge Lomax, in his copious and valuable *Digest of the Laws, respecting Real property in the United States,* considering the doctrine of implied trusts, lays down thirteen different

causes when such a trust may be raised. For the purpose of considering the case now before us, it will only be necessary to copy the second and eleventh. He says an implied trust is raised "where an estate is purchased in the name of one person and the consideration is paid by another;" also, "where fraud has been committed in obtaining a conveyance." 1 *Lomax Digest*, 200.

Thus we believe it to be a well established principle, both in England and most of the United States, that if one man purchases an estate in lands and does not take the conveyance in his own name, but in trust of another, the trust of the legal estate results to him, who pays the purchase money. This trust results by the mere operation of law, though the person, in whose name the conveyance is taken, executes no declaration of trust, and may be proved by parol evidence. *Sugden on Vendors*, 443; *Gascoigne vs. Throing*, 2 *Vern.*, 366; *Ross vs. Nevill*, 1 *Wash.*, 16; *Foster vs. Trustees of the Atheneum*, 3 *Ala.*, 302; *Dillard vs. Crocker*, *Spears, ch.* 20; *Dorsey vs. Clarke*, 4 *Har. & J.*, 551; *Bank of the United States vs. Covington*, 7 *Leigh.*, 466; *Paul vs. Chantian*, 14 *Miss.*, 580; *Page vs. Page*, 8 *N. H.*, 187; *Long vs. Steyer*, 8 *Texas*, 460; *Purdy vs. Purdy*, *Md.*, *Ch. Dec.*, 547; *Creed vs. Lancaster Bank*, 1 *Ohio State R.*, 1; *Banan vs. Banan*, 24 *Vt.*, 375; *Strumpler vs. Roberts*, 18 *Penn. State R.*, 283; *Barker vs. Vining*, 30 *Maine*, 121. However, in some of the States, the law does not allow a trust to result in favor of one paying the purchase money, if the deed is taken in another's name, if there is no fraud in the transaction. This is the rule in New York, with this exception, "unless it is done without the knowledge or assent of the party paying the money, or unless the party paying the money have creditors, in which case a trust results in their favor. So, if A purchases land with B's money and takes a deed to himself, with the knowledge of the owner of the money, it will not raise a resulting trust in his favor." *Norton vs. Stone*, 8 *Page*, *Ch.* 222; *Jenks vs. Alexander*, 11 *Page*, *Ch.* 619; *Brewster vs. Power*, 10 *Page*, *Ch.* 562; *McCartney vs.*

*Bostwick*, 32 *N. Y.*, 59. A like rule prevails in Minnesota, Kentucky, Indiana and Michigan. But in Minnesota, if one pays money for an estate and takes a deed in another's name, it will be presumed to be a fraud. In Indiana, if an agent pays his principal's money and takes a deed in the name of a stranger, without the knowledge and assent of the principal, it will raise a trust in favor of the latter. In Michigan, a trust cannot be raised by parol. *Sumner vs. Sawtelle*, 8 *Minn.*, 318; *Graves vs. Graves*, 3 *Met.*, 169; *Wynn vs. Shuner*, 23 *Ind.*, 375; *Grosbeck vs. Seely*, 13 *Mich.*, 345. It may be considered, also, as well settled in this country, that a resulting trust may be established, upon parol evidence, against the answer of the grantee denying the trust; but the evidence must be full, clear and satisfactory. *Boyd vs. McLean*, 1 *Johnson's Ch.* 582; *Elliot vs. Armstrong*, 2 *Blackford*, 199; *Snelling vs. Utterback*, 1 *B. M.*, 609; *Larkins vs. Rodes*, 5 *Porter*, 196; *Page vs. Page*, 8 *N. H.*, 187.

There is no doubt, also, that such a trust may be set up after the death of the nominal purchaser. *Freeman vs. Kelly*, 1 *Hoffman*, 90. By far the most numerous class of cases, where the doctrine of resulting trusts has been sought to be applied, are those where the purchase money for the conveyance of land has been paid in part or in whole by one man and the title deed taken in the name of another. The case before us is somewhat different from those heretofore adjudicated. Here we have an authorized agent making a purchase of land for a principal; the agent paying his own money for the land and the vendor making a deed to the principal, who did not afterwards refund the purchase money thus advanced or in any way endeavor to ratify the acts of the agent. In the meantime the agent holds the muniment of title and takes possession of the land. Do these facts create an equitable lien, in the nature of a resulting trust, in favor of the agent? A resulting trust is a mere creature of equity, founded upon presumptive intention and designed to carry that intention into effect, not to defeat it. It will not attach in the

person paying the purchase money, if it was not the intention of either party that the estate should vest in him. *Botsford vs. Burr*, 2 *Johnson's Ch.*, 405; *Steeve vs. Steeve*, 5 *Ib.*, 18; *Syme vs. Harder*, 1 *Page*, 494; *White vs. Carpenter*, 2 *Ib.*, 218; *Phillips et al. vs. Cramond*, 2 *Wash. C. C.*, 441; *McGuire et al. vs. McGowen*, 4 *Dessaussure*, 487; *Page vs. Page*, 8 *N. H.*, 187; *Elliot vs. Armstrong*, 21 *Blackford*, 199; *Sedge vs. Morse*, 16 *Johnson*, 199.

Equity will not make contracts for parties, but will look close to their intention and design in reference to their transactions, as manifested by the circumstances of the case, and, when discovered, will endeavor to carry out and enforce the same. And even when intention has been frustrated or turned aside by fraud or mistake, equity will control and cancel such fraudulent transactions, correct the mistake and give the property or title its proper direction, in strict accordance with the intention or purpose of the parties.

But it is not necessary to look to the circumstances which surround this case for the evidence of intention, but simply to the agreement of the parties as alleged in the bill. Then it appears that Smith, as the agent of Northrop, was to purchase the lands for him, which he did do, and advanced the purchase money, not as a *loan to him*, upon the security of the lands, or for the purpose of converting the money into lands, but as an advance to Northrop to enable him to accomplish the objects of his principal.

From all these circumstances no intention of a trust can be gathered. It was not intended by Smith to invest the money advanced to Northrop, in said lands, but as the agent of Northrop, and upon the faith of his agreements to pay the same back, with an hundred dollars for his services and necessary expenses, he paid the money. The money advanced was not made by Smith for a specific part of, or direct interest in the lands, but simply as the agent of Northrop, for him and upon the faith of his personal credit and previous agreement.

It being evident, from the above agreement and authorities, that Smith can have no trust declared in his favor, it may be asked, inasmuch as he was the agent for Northrop and advanced the money to make the purchase, what equities he had for such advances, or what remedy had he against Northrop or the lands purchased?

*First,* If Northrop was a non-resident of Arkansas, as alleged in the bill, he could have made out his account against him, attached it to the proper affidavit, under the statute, attached the lands and had them sold to pay the debt. See *Gould's Digest,* 163, *Secs.* 1, 2, 3, *etc.* Here would have been a complete remedy at law.

*Second,* Smith could have sent his account to Illinois and there brought assumpsit for money paid for Northrop, at his request, and Northrop, not being insolvent, he in this way had another complete remedy at law.

Independent of these personal remedies, agents have, for the payment of their commissions, advances, disbursements and responsibilities, in the course of their agency, an established right, which in many cases becomes more important and effectual than any other means of remedial redress; that is to say, an agents' lien. Story, in his work on agency 433, defines this lien "to be a right in one man to retain that which is in his possession, belonging to another, until certain demands of him, the person in possession, are satisfied. It is a qualified right therefore, which may be exercised over the property of another person."

These liens of agents, like all liens, arise by operation of law. Chief Justice Gibbs, in *Wilson vs. Heather,* 5 *Taunton,* 642, said: "The right of lien does not arise out of any contract whatsoever, but out of a right to hold property, until the party claiming the lien has been paid for the operation he performs."

Thus we see, if Smith was an agent of Northrop and, in carrying out the objects of his agency, he advanced money or incurred expenses for his principal, he had a lien and only a

lien upon the title papers and the land for his commissions, services, expenses and advances, which grew out of this relation and was ·incident to Northrop's indebtedness to him. The extent of this was but a mere right to retain them until his demands were satisfied, and in this case, the property being real estate, he could retain it until the rents and profits had discharged the lien. In case of a mortgagee who ejects his mortgagor, he can only hold the lands until the rents and profits pay his debts or discharge his lien. So, if a mortgagor voluntarily surrenders the possession, no absolute estate passes to the mortgagee by virtue of his possession, but simply a right to retain the same for certain purposes, nor is it any adverse holding so as to ripen into a title, except upon mere presumption of payment. 2 *Hilliard on Mortgages*, 16.

It cannot be contended that an agents' lien stands upon higher ground than that of a mortgage created by the solemn act of the parties.

Then Smith, having no title, could not convey a greater one to Danley, the appellee, and having merely a lien which could not exist for a moment without possession, it could not be transferred, and the effort of Smith to release the same to appellee, and delivering him the possession, as alleged in the bill, destroyed the lien and the appellee took nothing by his release. *Story on Agency, Sec.* 360, 367. Hence, appellee can have no title or right of possession to the lands in controversy by reason of Smith's lien.

Implied liens and equitable mortgages are the creatures of a court of equity, which Smith, by timely application, could have invoked, and if he had obtained a decree to that effect, he could have enforced it against the lands. Such liens and mortgages are incidental to the debt and if that debt has been paid or barred by the statute of limitations, the lien is gone; therefore, the indebtedness from Northrop to Smith, having been created in 1840, Smith failing to apply the remedies at his command within three years, the period of limitations applicable to such demands, he was barred from enforcing

them, and with the death of the remedy the lien ceases to exist.

We next come to consider the question as presented in our second proposition.

Was the possession of the land by Smith, and Danley, his vendee, of such a nature and held for such a length of time as ripened into a perfect title?

It has been well settled that the possession upon which the statute of limitations will operate, for the holder, must be adverse, actual, continuous and unbroken for the full period prescribed by the statute—if there be an interruption of holding, the term of adverse possession is closed and upon a resumption of possession, a new point is made from which limitations will again begin to run. *Angel on Limitations, Chap.* 31, *Sec.* 84; *Potts vs. Gilbert,* 3 *Wash. C. C. R.,* 478; *Doe vs. Campbell,* 10 *John.,* 477; *Roderick vs. Searle,* 5 *Seg. & Rawles,* 240; *Anderson vs. Mulford,* 1 *Haywood,* 320; *Doe vs. Ridley,* 1 *N. C.* 282; *May vs. Jones,* 4 *Litt.,* 23; *Sharp vs. Johnson,* 22 *Ark.,* 79.

The possession of Smith and Danley must have been adverse, hostile. What constitutes possession, and what evidence is sufficient to support it, are, of course, questions of law. Entering or appropriating the profits under a claim of exclusive right or with palpable *intent* to possess exclusively, when the other is not in actual possession, *is* an actual ouster and any actions palpably displaying such intention are evidence competent to render the entry an ouster. See the cases cited in *Parker vs. Proprietors of Locks and Canals, on Merrimack river,* 3 *Met.,* 91; *Prescott vs. Nevers,* 4 *Mason,* 330; *Marcy vs. Marcy,* 6 *Met.* 360; *Abercrombie vs. Baldwin et al.,* 15 *Ala.,* 364; *Calhoun vs. Cook,* 9 *Barr.,* 226; *Dukeman vs. Parish,* 6 *Ib.* 212; *Doe vs. McCleary,* 2 *Carter, Ind.* 405; *Johnson et al. vs. Tonnelin,* 18 *Ala.*

Sole possession or retainer of the profits for a *great* length of time, is competent evidence for a jury, of an *intent* or *claim* to possess exclusively, therefore, competent evidence of act-

ual ouster. *Chambers vs. Pleak*, 6 *Dana*, 426; *Bolton vs. Hamilton*, 2 *Watts & Sergeant*, 294; and cases there cited. It must have been *actual*. There must, therefore be, in all cases, an *entry*, in order that an ouster may be made, and an adverse possession begun. And it would seem that the legal notion of an *entry* to divest a possession, is the same with that required to revest possession, viz: a going upon the land with palpable intent to claim the possession as his own. *Miller vs. Shaw*, 7 *Seg. & Rawles*, 129; *Lessees of Holtzapple and wife vs. Philibaum*, 4 *Wash, C. C.* 356; *Altemus vs. Campbell*, 9 *Watts*, 28.

The nature of this claim of possession which must accompany the intrusion into the land, in order to constitute an entry, appears to be, not the assertion of a previously existing right to the land, but the assuming of a right to the land from that time, and a subsequent holding with assertion of right. This is what is meant when it is said that the possession must be taken under claim of right. This intention to claim and possess the land, is *one* of the qualities indispensible to constitute a disseisin, as distinguished from a trespass. *Ewing vs. Barnett*, 11 *Peters*, 41. For one going upon the land and staying there, without claiming or asserting the land to be his own, is a mere naked intruder or trespasser, and effects no ouster. *Society for the Propogation, etc. vs. Paulet*, 4 *Peters*, 480; *Lessee of Clark et al., vs Courtney*, 5 *Ib.*, 320. To bar a legal title, an entry on the land is indispensible; payment of taxes, alone, will not do. *Sorber vs. Willing*, 10 *Watts*, 141; *Humphreys vs. Rohn*, 480, 8 *Ib.*, 78; *Naglee vs. Albright et al.*, 4 *Wharton*, 291; *Murphy vs. Lloyd*, 3 *Ib*, 538.

There seems to be no cases to contradict this, when a legal title is to be barred. In *McCall vs. Wily*, 3 *Watts*, 69, there was an entry, and payment of taxes was relied on to define the extent of the ouster or the amount of land that was actually held.

It must have been continuous. If the property is of a character to admit of permanent, useful improvement, the possession should be kept up during the statutory period,

by actual residence, or by continued cultivation or.enclosure. *Johnson vs. Irwin*, 3 *Serg. & Rawle*, 291; *Roger vs. Benton* 10; *Ib.* 303; *Jackson vs. Schoonmaker* 2,. *Johnson*, 230.

Occasional occupancy, with payment of taxes, will not do; *Sorber vs. Willing*, 10 *Watts*, 141; but if the same is not such as to admit of residence or improvement, such use and occupation of it, as from its nature it is susceptible of, with claim of ownership, will be an actual possession. *West vs. Humphreys*, 162.

It must have been unbroken. As to whether several adverse possessions can be tacked together, the States differ among themselves. In South Carolina, in *King vs. Smith*, *Rice* 11, it was decided that they cannot be joined by conveyance from one to another. In the case of *Lessee of Potts vs. Gilbert*, 3 *Wash C. C., R.* 475, Judge Washington was clear that when several persons enter into possession, the last cannot tack the possession of his predecessor to his own, and even if there had been conveyances, he asks: "What had any of them in point of title to convey." In *Mason vs. Small*, 9 *Barr*, 194, it was said that Judge Washington's decision in *Potts vs. Gilbert*, was never acknowledged as sound law by any. land lawyer or judge of that State.

In New York, Vermont, Massachusetts, Pennsylvania, Kentucky and Tennessee, possessions may be tacked, if one comes in under the other, and the possessory estates are connected and continuous, not otherwise. *Brandt vs. Ogden*, 1 *Johns*, 156; *Jackson vs. Thomas*, 16 *Ib.*, 293; *Winslow et al., vs. Newell*, 19, *Vt.*, 164; *Ward vs. Bartholomew*, 6 *Pickering*, 410; *Wade vs. Lindsey*, 6 *Met.*, 407; *Melvin vs. Proprietors of Locks and Canals on the Merimack river*, 5 *Ib.*, 15; *Overfeild vs. Christie*, 7 *Serg. & Rawles*, 173; *McCoy vs. Trustees of Dickinson College*, 5 *Ib.*, 254; *Adams et al. vs. Ternnan et al.*, 5 *Dana*, 399; *Chilton et al. vs. Wilson's heirs* 9 *Humph.* 399:

It seems also, that the possession, to be an ouster, must be of such a nature, and of such notoriety as to raise the presumption that the owner will have notice of it and its extent.

See *Proprietors, etc., vs. Call.,* 1 *Mass.,* 483; *Proprietors, etc., vs. Springer,* 4 *Mass.,* 416; *Herbert vs. Hanrich,* 16 *Ala.,* 581. As to the extent of the possession it is generally conceded that if one enters into possession under a deed, his possession is deemed to extend to the bounds of that deed, though he actually possess only a small part. In *Ewing vs. Bennett,* 11 *Peters,* 41, it is said: "It is well settled, to constitute an adverse possession, there need not be a fence, building or other improvement made; it suffices for this purpose, that visible and notorious acts of ownership are exercised over the premises, in controversy, for twenty-one years, after an entry under claim and color of title."

Applying the above tests and principles to the possession of Smith and Danley, we are compelled to say that there was no such adverse, continuous and intentional possession, as will satisfy the requirements of the Statute of Limitations, in conferring any right or title whatever, upon them, by reason of such possession. Because, under the Act of January 4, 1851, the law then in force, the period of limitation for real property, in this State, was ten years. *English's Digest,* 98, *Section* 1.

The allegations of the bill are, that Smith, through his agents, at Little Rock, took possession of said land in 1840, and continuously, uninterruptedly and adversely to all the world, continued to have notorious and peaceful possession; when the proof only shows a constructive possession by payment of taxes up to 1845, when he sent his agent, Bond, to take possession, and cultivated the cleared land, and paid taxes until 1849. See *Dep.* 243. Danley then bought of Smith, and alleges that he took possession, but nowhere is it shown that he held actual possession until the expiration of the ten years, except by the payment of taxes for a few years. Never occupied any portion of them, or improved or cultivated them, or even manifested any claim thereto, except by having his agent, Robbins, survey a portion of it off into town lots,

which, as we have already seen, is not a sufficient possession under the Statute of Limitations.

This case, also, presents the question, whether partition can be had, in chancery, when the property, asked to be divided, is held adversely, or when the title is in dispute. In the case of *Adams vs. Ames Iron Co.*, 24 *Conn*, 330, the court says: "It was an established rule of the common law, by which the writ of partition would be only between co-partners; that the plaintiff must be in possession or seized of the lands when the writ was brought; and since the remedy by partition has been extended to joint tenants and tenants in common, the same rule has been uniformly adopted, whether the remedy is sought by writ or bill in equity."

In the case of *Leno vs. Patterson*, 1 *Watts & Serg*. 185, it was determined that an adverse holding by one tenant in common for any length of time, however short, previously to the institution of an action of partition, will bar a recovery in such form of action. In the case of *Daniel vs. Green et al.*, 42 *Ill.*, 473, wherein one party was holding adversely to the one who sought partition, the court says: "To permit the bill to be maintained, would be to hold that purely legal titles may be tried by a suit in Chancery, instead of by an action of ejectment, in every case to recover lands adversely held."

In the case of *Longwell vs. Bently*, 3 *Grant's cases, Penn.*, 177, the court says " This action cannot be supported without proof that the parties, at the commencement of the suit, held the land together. Proof that the one in possession held adversely for any length of time, however short, is proof that they did not hold together, and entitled the defendant to a verdict.' In the case of *Bonner et al. vs. Props. of the Kennebeck Purchase*, 7 *Mass.*, 475, the court observes, that partition only lies for persons actually seized, and the petitioners were non-suited.

We do not, however, conceive that the rule, above stated, extends to lands unoccupied, when there is only that possession in law which is connected with the title to the land. There could be no adverse possession under the circumstances

and those having the legal title would, in law, be seized of the land in such sense that they would be entitled to a partition. But when one is in the adverse possession of land, claiming it exclusively against all others, another, claiming title and out of possession, cannot maintain his bill. He must first try his right in an action of ejectment, and after that is established, he may institute his proceedings for partition.

In the case before us, the bill distinctly alleges that the complainant is out of possession and that other parties, than those he asks to have the lands divided among, are adversely in possession and claim to own them under a title adverse to them. Which has the better title is purely a legal question and can only be settled in a court of law.

It is a maxim of equity jurisprudence, of universal application, that where a party has a full, adequate, and complete remedy at law, he cannot seek relief in a court of equity; such we deem the appellee has had at all times. Not even the *quia timet* jurisdiction of a court of Chancery can be called into operation, except upon an apprehension of an injury to a party from an assertion of an injury, which he has no means of procuring to be tried in the ordinary tribunals of law.

It is clear, from the examination of the whole case, that whatever right or title appellee has to the land in question, he derives through the Northrop deeds, and upon the strength of them he must rely. The titles thus derived are legal ones, and the controversies arising upon those deeds and their construction are purely questions of law. However, it may not be deemed improper to express our opinion on those titles. But the court does not assume a definitive decision upon them, with a view to a decree upon that basis, as that decision is properly to be made by a court of law, but with a view to prevent further litigation upon that point.

From the deeds presented in the record, the appellee has the life estate of Henry Northrop in the lands, as stated in

the bill; upon the death of said Northrop, he is entitled to one-fourth of the remainder.

One of the witnesses stated that Henry Northrop is now dead, but inasmuch as this fact is not alleged in the bill, we have treated the case as though he were alive.

The decree of the White Circuit Court, in Chancery, is reversed and the cause remanded with instructions to dismiss the bill for want of equity.