[Sac. No. 3005. In Bank.—April 4, 1922.]

## W. E. ARMSTRONG et al., Respondents, v. H. G. PAYNE et al., Appellants.

[1] WATERS AND WATER RIGHTS — ADVERSE USER—VERBAL AGREEMENT—EVIDENCE.—In an action by riparian owners along a creek to quiet their title to all the waters of the creek and enjoin the defendants from interfering therewith, in which the defendants rely upon appropriations and adverse user to establish their right to divert a given quantity of said waters, it was reversible error for the court to strike out evidence offered by the defendants to prove a verbal agreement alleged to have been made between plaintiffs' predecessor and one of the defendants, as to the use and diversion of said waters, defendants claiming that the use was continued under said agreement for a time sufficient to give them a right thereto by prescription, as the evidence was admissible to characterize the subsequent use of the waters, and as tending to establish that the use by the defendants thereafter was under a conceded and uninterrupted claim of right and for the purpose of establishing the defendants' claim as against the riparian claims of plaintiffs and their predecessor.

[2] ID.—NATURE OF CLAIMS—STATUTE OF LIMITATIONS.—Such agreement was not admissible because it was a valid agreement, or solely because it was a declaration of the predecessor of some of the plaintiffs, but because it showed the nature of the claims of the respective parties during the time the statute of limitations was running, and the extent of the defendants' claims.

[3] ID.—AGREEMENT—RIGHTS OF DIFFERENT PLAINTIFFS—JUDGMENT. If the defendants, by reason of such agreement and a continuous adverse user thereunder for five years, had established their right to the use of the waters of the creek, or of any portion thereof, as against the riparian rights of the property owned by the predecessor of plaintiffs who made the agreement, and had failed to acquire such right as against the property of another of the plaintiffs, the decree should have adjudicated their respective priorities and rights accordingly, as the defendants may have secured a prescriptive title to the water against one lower riparian owner and not against another.

[4] ID.—STATUTE OF LIMITATIONS — WHAT CONSTITUTES INTERRUPTION.—In order to interrupt the running of the statute of limitations, as to flowing water, there must be a resumption of the possession thereof under a claim of right brought home to the adverse claimant either by express notice to that effect or by conduct so notorious and unequivocal as to imply such notice.

In other words, the interruption of the possession must rise in dignity and character to that required to initiate an adverse possession.

[5] ID.—ADVERSE CLAIM.—Intermittent use and adverse claim may establish a right to use water intermittently and for part of the irrigating season only, and if that right is insisted upon and maintained without interruption, a corresponding prescriptive right arises.

APPEAL from a judgment of the Superior Court of Modoc County. C. A. Raker, Judge. Reversed.

The facts are stated in the opinion of the court.

Curtis Hillyer and C. S. Baldwin for Appellants.

Jamison & Wylie and D. B. Robnett for Respondents.

WILBUR, J.—This is an action by riparian owners along Fitzhugh Creek, in Modoc County, to quiet their title to all the waters of Fitzhugh Creek and enjoin the defendants from interference therewith. The defendants rely upon an appropriation of 200 inches made in 1886 and one of 50 inches made by defendant Gertrude French in September 1912, and upon adverse use of the waters of said stream from 1886 and 1912, respectively. The trial court found that there was no prescriptive right in the defendants in and to any portion of the waters of Fitzhugh Creek and adjudged that all the waters of said creek belonged to the plaintiffs as riparian owners. Defendants appeal from the judgment and attack the findings with relation to adverse use. It appears from the evidence without contradiction that in 1886 H. G. Payne posted a notice of appropriation of 200 inches of water at the point of diversion on Fitzhugh Creek above the land of the plaintiffs; that at the same time he also posted a notice of appropriation of 200 inches of water on a stream known as Mill Creek and recorded copies of such notices. The watersheds of Mill Creek and of Fitzhugh Creek are entirely separate and the land upon which the defendants diverted the water from said streams is outside the watershed of both streams. In pursuance of the notice of appropria-

---

5. Right of riparian owner to prevent diversion of flood water, notes, Ann. Cas. 1914A, 82; 22 L. R. A. (N. S.) 391.

tion the defendant H. G. Payne built a ditch and flume about two miles long to carry the waters of Mill Creek to a point in Fitzhugh Creek about seven miles above their point of diversion, at which defendants also constructed a diverting dam, ditches, and flume leading from Fitzhugh Creek to their land and constructed upon their land certain reservoirs in which the waters diverted from Fitzhugh Creek could be stored when not otherwise used. It was conceded in the trial court that the defendants were entitled to take from Fitzhugh Creek all the waters they deposited in said creek from Mill Creek, less an estimated evaporation of 15 per cent, and the decree established that right by providing that measuring-boxes should be placed at the point of diversion from Fitzhugh Creek and at the point where the waters from Mill Creek were emptied into Fitzhugh Creek and fixed the right of the defendants at the point of diversion as 85 per cent of the amount actually emptied into Fitzhugh Creek from Mill Creek, and no more. Both Fitzhugh and Mill Creeks are fed by melting snows. The watershed of Mill Creek is at a much higher elevation than the watershed of Fitzhugh creek, consequently the snow melts later in the spring in Mill Creek watershed than in Fitzhugh Creek watershed. During the early part of the spring the snows melt with such rapidity in the watershed of Fitzhugh Creek that the stream overflows its banks. The defendants claim that from and after 1886 they continuously diverted 200 inches of water from Fitzhugh Creek at the point of diversion; that this use was continuous during the entire period that such an amount of water was flowing in the stream. They and their successors, some of whom are not parties, consequently claim that the right to take the full 200 inches of water at the point of diversion on Fitzhugh Creek has been established by reason of such adverse use. Of the 200 inches so diverted one-fourth belongs to Carlos Payne and 33 inches has been conveyed to others not parties, and the total amount claimed by H. G. Payne is 117 inches continuous flow and by Gertrude French, 50 inches. The latter right is claimed, under her appropriation made in the year 1912, "during the period of melting snows."

In ordinary seasons the Mill Creek water was turned into Fitzhugh Creek about June 10th, but sometimes the water was turned in as early as May 15th, and it had been turned

in as late as July 15th.   H. G. Payne testified that his diversion ditch ran full at all times when water was running in Fitzhugh Creek, regardless of whether Mill Creek was diverted thereto.   The defendants claim that their title to the waters of Fitzhugh Creek, during the early spring, before the Mill Creek waters were deposited therein, is thus established by adverse use.   The only conflict in the evidence is as to the quantity of water actually diverted by the defendants from Fitzhugh Creek and from Mill Creek and as to alleged interruptions of the adverse use of the waters of Fitzhugh Creek by the defendants.

The plaintiffs rely upon the proposition that the use of the defendants was interrupted from time to time and that because of such interruptions there was no period of five years during which the defendants continuously diverted the water claimed by them.   The defendants, on the other hand, claim that the interruption of their use was surreptitious and covert; that such breaches as were made in their diverting dam were at once repaired by defendants and the water was again diverted into the defendants' ditch, and that by reason of the surreptitious character of the acts alleged to constitute the interruption, if they occurred as claimed by plaintiffs, such acts were insufficient in law to break the continuity of use necessary to establish defendants' rights by prescription.

The defendants thus claim the right to 117 inches of the waters of Fitzhugh Creek up to the time Mill Creek waters are deposited therein, and particularly during the usual flood period claim such right, plus the 50 inches appropriated by Gertrude French.

[1]   We will first consider an erroneous ruling as to the admissibility of certain evidence which will require a reversal. The defendants offered to prove a verbal agreement between John Doten made in 1887, when he owned the property now owned by the plaintiffs, Clark brothers, whereby some arrangement was made as to the use of the waters of Fitzhugh Creek, defendants claiming that the use was continued under said agreement until 1897, when John Doten died, and thereafter until the Clark brothers bought the place in 1914.   The offer was objected to by the plaintiffs, the objection was sustained, but subsequently the evidence was

admitted and then stricken out. Its general character can be seen from the following excerpt therefrom:

"Q. What was this arrangement, Mr. Payne? A. The arrangement was that I was to run all Fitzhugh Creek water and to take all of the water in the fall of the year except sufficient water to water his stock, and that I was to have my appropriation, excepting in the fall of the year I was to let enough water go down the creek for his stock water.

"Q. You were always to permit sufficient water to run down to his place on Fitzhugh Creek for stock purposes, is that it? A. That was it exactly.

"Q. Was there any arrangement between you and Mr. Doten in regard to the Mill Creek water? A. No, sir; only he told me at that time that he had been to Mill Creek and he was satisfied that we were running the full amount of water, and that he had been up to Mill Creek and had seen the water running. . . .

"Q. Was there any arrangement with you as to not turning the water from Mill Creek until a certain season of the year? A. Yes, sir; part of the agreement was that I was not to turn the Mill Creek water in until the first part, or about the 10th of June, and the reason he stated was because it damaged him by making the water too high, and that it cut out the dam at the house, and that if I put the Mill Creek water in too early it was dangerous to his ranch. It was settled by us on that basis that I was not to put the water in from Mill Creek until between the first and 10th of June, and I was to leave sufficient water in the creek to water his stock and that was all he needed after the first day of June, as he had no use for the water except for stock.

"Q. From that time on did you always turn the Fitzhugh Creek water and the Mill Creek water and handle it in accordance with this arrangement you had with him? A. Yes, sir. John Doten is dead. He died in December, 1897, eleven years after I made my appropriation.

"Q. During those eleven years, Mr. Payne, were you using water continuously from Fitzhugh Creek and Mill Creek under your appropriation and in accordance with your agreement, that is in the manner that you had agreed on with Mr. John Doten? A. Yes, sir.

"Q. During that time did he ever make any objection or in any way interrupt your use of the water? A. He did not. . . .

"A. The agreement was, that I was to continue running the water the way I was from Mill Creek, but that I was not to turn the water in before the first or 10th of June, and he had no objection to my running the water of Fitzhugh Creek, and after July or August in the fall of the year I was to take my full amount of water but I was to allow sufficient water to go down the creek to water his stock.

"Q. He agreed that you could turn Mill Creek water into Fitzhugh Creek and then take it out again, and that was all he agreed to, was it not? A. No, sir, it was not.

"Q. What was that agreement then? A. I was to run the Mill Creek water but I was to take my appropriation from Fitzhugh Creek also.

"Q. He agreed that you might take the waste water, take the water of Fitzhugh Creek when he did not need it? A. He agreed that I should take my appropriation. . . .

"Q. After the irrigating season was over he did not object to your taking the Fitzhugh Creek water if you let enough come down the Creek for his stock and irrigating purposes, is that correct? A. He did not object to my taking all my appropriation out of Fitzhugh Creek. If my 200 inches would not dry the creek, he had no objection, but he wanted me to allow enough water to come on down for his stock. . . .

"Q. He never agreed with you that you could take 200 inches of water from Fitzhugh Creek and deprive him of it, did he? A. That is what he agreed to, that if the water was not there, before I turned it in from Mill Creek, I was to have my 200 inches of water, just the same.

"Q. But during the irrigating season you were only to take out from Fitzhugh Creek only what was turned in from Mill Creek, isn't that the case? A. No, sir, I was to have my 200 inches of water and by reason of my putting that Mill Creek water in about the 10th of June he was not damaged in any way.

"Q. He did not object to your taking out 200 inches of water during the irrigating season because you put that much in from Mill Creek and he never lost it, is that the case? A. He told me he was willing for me to run that

200 inches, because he had been to Mill Creek and knew I was not damaging him.

"Q. Are you willing to say to the Court in this case that John Doten agreed with you that you could take out 200 inches of water from Fitzhugh Creek any time of the year, regardless of what you put in from Mill Creek? A. Yes, sir, and that is a fact.

"Q. Why did you say a few minutes ago that in the fall of the year you were to have this right? A. That was if the creek was to get down low, it was understood that I was to leave enough water for his stock, because in the irrigating season there was plenty of water."

The evidence should not have been stricken out. The evidence of the agreement was clearly admissible to characterize the subsequent use of the water, and as tending to establish that the use by the defendants thereafter was under a conceded and uninterrupted claim of right and for the purpose of establishing the defendants' claim as against the riparian claims of John Doten and his successors, the Clark brothers. (*Bakersfield T. H. Assn.* v. *Chester,* 55 Cal. 98, opinion on petition for rehearing, p. 102; *Oneto* v. *Restano,* 78 Cal. 374 [20 Pac. 743]; *Northern California Power Co. Cons.* v. *Flood,* 186 Cal. 301 [199 Pac. 315]; *Bree* v. *Wheeler,* 4 Cal. App. 111 [87 Pac. 256].) [2] The agreement was not admissible because it is a valid agreement or solely because it is a declaration of a predecessor of the Clark brothers (secs. 1849, 1853, Code Civ. Proc.), but because it shows the nature of the claims of the respective parties during the time the statute of limitations was running, and the extent of the defendants' claims.

[3] If the defendants, by reason of such agreement and a continuous adverse use thereunder for five years, had established their right to the use of the waters of Fitzhugh Creek, or to any portion thereof, as against the riparian rights of the Doten property, and had failed to acquire such right as against the Armstrong property, the decree should have adjudicated their respective priorities and rights accordingly. The case was apparently tried on the theory that the riparian rights of the plaintiffs were identical and were both preserved against the claims of the defendants by interruptions of their adverse use by either, while, in fact, the defendants may have secured a prescriptive title to the

water of Fitzhugh Creek against one lower riparian owner and not against another.

This ruling on the evidence was prejudicial and necessitates a retrial.

[4] In view of a new trial, we will consider the contentions of the parties as to what constitutes an interruption of an adverse use of water. In the case of *Cave* v. *Crafts,* 53 Cal. 135, 138, a statement is quoted from Wood on Nuisances (vol. 1, p. 438), to the effect that any interruption of the continuity of use by an adverse claimant, "however slight," prevents the acquisition of the right by such use. In that case it does not clearly appear from the opinion what the nature of the interruption was. In that case Crafts claimed several distinct rights in the water flowing in a diverting ditch. Some of his claims were conceded. It was conceded that Crafts had the right to use all the water of the stream from 3 P. M. to 9 P. M. on Tuesday and Friday in each week, but Crafts, in addition, claimed the right to use the flow of one-sixth of the stream from 3 to 9 P. M. of the other five days by reason of his ownership of a tract of land known as the "Carpenter" ranch and also that he was entitled by reason of adverse possession to a reasonable flow of water for irrigating and domestic purposes upon two other places owned by him known as the "See" place and "Criswell" place. With reference to the alleged tolling of the statute of limitations by interruptions, the court merely said: "It is enough to say that the use of water upon those places—as the case clearly shows—was not peaceable, as that term is applied in connection with the subject we are considering, but was disputed and not infrequently interrupted by plaintiffs and their grantors."

The case, therefore, is only authority for the proposition that where the claimed use is frequently interrupted and the possession is not peaceable there can be no title by prescription. However, this case is cited in *Ball* v. *Kehl,* 95 Cal. 606, 613 [30 Pac. 780, 782], as authority for the proposition that: "Interruption of adverse user, however slight, prevents acquisition of title by prescription."

But the latter case involved a claim of adverse use where the claimant had used the water "during a part of the period of five years" (p. 614), and consequently is not authority upon the question as to how slight an interruption

or what sort of an interruption would prevent the prescriptive right accruing. Both cases are cited in *Bree* v. *Wheeler*, 129 Cal 145, 147 [61 Pac. 782], to the same effect, as follows: "Interruption of adverse user, however slight, prevents acquisition of title by prescription." The trial court in that case had found as a fact "that the use of said water by the defendant has been every year, *at least, once* interrupted, by turning it out of the head of defendant's ditch by the plaintiff, but the court finds such acts by the plaintiff to have been mere trespasses." (Italics ours.) In commenting upon this finding the court stated: "It may have been interrupted many times during each year, and the finding be true. The court adds that the interruptions were 'mere trespasses.' If the water was the property of plaintiff, he had the right to turn it out of defendant's ditch, and he would not commit a trespass in so doing. A man can do as he pleases with his own property without committing a trespass. *The finding does not show how long these interruptions continued, nor whether they were as continuous as the use by defendant.* Neither does the finding show that the use by defendant has been open or notorious." (Italics ours.) Upon the second appeal of this case after a new trial (*Bree* v. *Wheeler*, 4 Cal. App. 109 [87 Pac. 255]), it was said: "As the plaintiff interrupted the defendant's use annually, no title by adverse possession could accrue . . . " However, the nature of the interruption is shown by the opinion of the court. Plaintiff claimed all the water and the defendant claimed half of it. It was agreed to divide the water equally. Pursuant to this agreement measuring-boxes were installed, but the plaintiff became dissatisfied and tore out the measuring-boxes, and thereafter the defendant used all the water. It appears from the opinion that the defendant's right to the water was continually protested and was actually interrupted by the destruction of the measuring-boxes.

The rule with reference to continuity of use is thus stated in Gould on Waters (3d ed.), section 335, pages 636, 637: "In order to support an easement by prescription, the adverse use must be continuous. . . . An occasional suspension or interruption of the enjoyment will not defeat the right, if it arises from such causes as the dryness of the season; a temporary failure to exercise the right to the extent claimed; or fluctuations in the flow of the stream. So an

entry by stealth, or for purposes other than those connected with the right to enter, will not break the continuity of exclusive possession in another. . . . '' Section 336: "The diversion of water from a stream by means of a trench is substantially continuous, although exercised only in certain months, or when subject to interruption during a part of each year by the owner of the land through which the trench is dug.'' The cases cited in support of this latter statement, however, show that the interruption referred to was with the consent of the adverse users. (*Bolivar Mfg. Co.* v. *Neponset Mfg. Co.*, 16 Pick. (Mass.) 241; *Cowell* v. *Thayer*, 5 Met. (Mass.) 257 [38 Am. Dec. 400]; *Swan* v. *Munch*, 65 Minn. 500 [60 Am. St. Rep. 491, 35 L. R. A. 743, 67 N. W. 1022].)

In Wiel on Water Rights in the Western States (3d ed., vol. 1, sec. 584, p. 630), it is said: "The terms 'exclusive' and 'uninterrupted' probably represent the same thing in this connection; namely, that to the extent of the right claimed, the claimant must not have shared the use with the true owner, nor suffered any act of dominion by him, such as an interruption. The use must be uninterrupted. Mere verbal objection is not an interruption; it must be some act actually causing a stoppage in the adverse use for a reasonable time, though it has been held that use under continual dispute is not adverse.''

In Kinney on Water and Water Rights (2d ed., vol. 2, sec. 1052), the right to acquire title by adverse possession by appropriation for definite periods of time is recognized, and it is stated in that regard: "But where the interruption in the continuity of the use is caused by the acts of the party against whom the adverse user in running, and not from the claimant's own free will, no right can be acquired by prescription.'' In section 1053 the author, in dealing with an interruption, says: "It may be made by the shutting off of the water at the time the claimant needs it,'' citing in support of the text the following California cases: *Bree* v. *Wheeler, supra; Cave* v. *Crafts, supra; Last Chance etc. Co.* v. *Heilbron*, 86 Cal. 1 [26 Pac. 523]; and also *Wasatch Irr. Co.* v. *Fulton*, 23 Utah, 466 [65 Pac. 205]. The cases cited have been already discussed, excepting the last two. In *Last Chance etc. Co.* v. *Heilbron, supra*, there could have been no serious question as to the sufficiency

of the interruption, and in the Utah case cited the only question pertinent to the statement in the text was in regard to the admissibility of evidence of the tearing out of a diverting dam as evidence tending to prove an interruption.

The authorities all seem to agree that the act of the owner, in order to constitute a tolling of the statute, must be open and either upon a claim of right, or so notorious as to constitute such a claim. If secret or surreptitious, it is unavailing. In Ruling Case Law (vol. 1, sec. 39, p. 723) it is said: "The running of the statute of limitations will be tolled by the owner's entry upon the land when accompanied with an explicit declaration of his purpose to repossess himself thereof, or by such open and notorious acts of dominion as make that purpose manifest. . . . In all cases, however, the intent, as expressed, or evidenced by acts of ownership, is that which governs the effect of the entry. The mere act of going upon the land is not enough. The owner must assert his claim to the land, or perform some act that would reinstate him in possession, before he can regain what he has lost. It is evident, therefore, that an entry by stealth, under circumstances going to show that he claimed no right to enter, or an entry for purposes other than those connected with a right to enter, would not break the continuity of the disseizor's possession." (See 2 Farnham on Water and Water Rights, sec. 539, p. 1750; sec. 561, p. 1807.)

In 2 Corpus Juris, page 96, paragraph 118, it is said: "While the essentials of an entry effective to interrupt an adverse possession will vary according to the premises involved, yet it must not be of a casual or secret character, but must be either known, or made under such circumstances as to enable the party in possession, by the use of reasonable diligence, to ascertain the right and claim of the party making the entry, and thus enable him to resort to legal remedies for its protection. There must be an explicit declaration or an act of notorious dominion by which the claimant challenges the right of the occupant. . . . It may be observed in this connection that there is a close analogy between the acts necessary to interrupt an adverse possession and those necessary to constitute open and notorious possession for the purpose of acquiring title by adverse possession."

A single interruption once every five years, under such circumstances as to challenge the right of the adverse claimant, will prevent the acquisition of a title by prescription, for there would then be no period of continuous user for five years. It was so held in the case of *Trenton Water Power Co.* v. *Raff*, 36 N. J. L. 335, 338, where the right to maintain a dam by which a portion of the plaintiff's land was flooded was involved, and it was claimed that there had been a maintenance of the dam and a right to flood said land obtained by adverse usage. It was said: "The proof was, that its maintenance had not been peaceably acquiesced in, and that on one occasion at least, within nineteen years before the trial, it had been torn out by persons who felt aggrieved by its existence. The court should have been asked to leave the question to the jury, whether the old dam had been maintained for the prescriptive period, under such circumstances as would give a right by prescription, with the instruction that if it had been so maintained, the plaintiffs were entitled to damages only for the injury in excess of that which resulted from the old dam."

The acts of the owner must be open and notorious and under a claim of right. (*Creech* v. *Jones*, 37 Tenn. 631; *Maysville & Big Sandy R. R. Co.* v. *Holton*, 100 Ky. 665, 675 [19 Ky. Law Rep. 1, 39 S. W. 27]; *Nelson* v. *Johnson*, 189 Ky. 815 [226 S. W. 94]; *Murphy* v. *Commonwealth*, 187 Mass. 361, 371 [73 N. E. 524]; *Byers* v. *Danley*, 27 Ark. 77, 93; *Thomas* v. *Spencer*, 69 Wash. 433 [125 Pac. 361]; *Brattain* v. *Conn*, 50 Or. 156 [91 Pac. 458].) In the last cited case (*Brattain* v. *Conn, supra*) the court held that frequent destruction of a diverting dam, if secret and clandestine, did not interrupt the statute of limitations. In that regard the court stated: "It clearly appears that for more than 20 years the plaintiffs and their predecessors in interest have asserted and exercised the right each year to construct and maintain, whenever necessary, a temporary dam or obstruction in the main channel of the river to divert from 2,000 to 2,500 inches of water into Small Creek for irrigation purposes, and without any intimation from defendants or their predecessors in interest that their right was questioned. It is true that defendant George Conn testifies that he often tore out and removed the dam, but there is no evidence that plaintiffs knew of this fact, or that it was done

at a time when they needed the water. It was a clandestine and secret invasion of their rights, and we do not understand that an entry by stealth and without the knowledge of the party in possession is sufficient to break the continuity necessary to constitute an adverse possession or to establish a right by prescription.''

The rule in 1 Cyc., pages 1010, 1011, subdivisions b and c, is cited with approval in *Thomas* v. *Spencer, supra,* and applied to a clandestine attempt to toll the statute of limitations by the partial damming of a stream by throwing a few sticks and stones therein.

Without further citation of authorities or a critical analysis of those already cited, it is clear that in order to interrupt the running of the statute of limitations, as to flowing water, there must be a resumption of the possession thereof under a claim of right brought home to the adverse claimant either by express notice to that effect or by conduct so notorious and unequivocal as to imply such notice. In other words, the interruption of the possession must rise in dignity and character to that required to initiate an adverse possession. The rule in regard to the latter is stated in *Thompson* v. *Pioche,* 44 Cal. 508, 517, as follows: ''To constitute adverse possession, the occupation must be open, visible, notorious, and exclusive, and must be retained under a claim of right to hold the land against him who was seized; and the person against whom it is held must have knowledge, or the means of knowledge, of such occupation and claim of right. Such knowledge, or the means by which such knowledge may be attained, must be brought home to the person who was seized or possessed of the land; because the statute proceeds on the ground that he, knowing that a cause of action exists in his favor for the intrusion, yet acquiesces in it, and does not attempt to regain the possession of his land in the mode provided by law. (Aug. Lim., secs. 391, 398; 2 Wash. on Real Prop., 490.) A clandestine entry or possession will not set the statute in motion, because the owner of the land cannot be said to have acquiesced in the wrongful entry or possession. The owner will not be condemned to lose his land because he has failed to sue for its recovery, when he had no notice that it was held or claimed adversely; but the statute cuts off his remedy only when he has neglected to

commence his action beyond the period assigned for it."
(See, also, *Grigsby* v. *Clear Lake W. Co.*, 40 Cal. 396, 406.)

The testimony offered in this case is to the effect that
Armstrong frequently destroyed the diverting dam in Fitz-
hugh Creek. If the court finds that this was done under a
claim of right brought home to the defendants either by
express notice to them, or that such destruction resulted in
such a resumption of the possession of his riparian rights
for such a time as was reasonably calculated to give the
defendants, as reasonable men, notice of such claim of right,
or of such resumption of possession, then the adverse use of
the defendant was interrupted, and if each five-year period
of adverse user was so interrupted, that is, if there was no
period of five years of continuous adverse user without such
interruption, the defendants would not have prescriptive title
as against the riparian owner so interrupting the adverse
use.

[5] The defendants only claim the waters of Fitzhugh
Creek during the early spring and summer before the waters
of Mill Creek are turned in, and during the season of flood
waters. Consequently, in considering the effect of the in-
terruptions which are relied upon by the plaintiffs to break
the continuity of use essential to establish title by pre-
scription, it should also be noted that the use does not have
to be of a continuous flow in order to establish a prescrip-
tive right. That is to say, the adverse claimant may es-
tablish a right to use water intermittently and for part of
the irrigating season only. If that right is insisted upon
and maintained without interruption, a corresponding pre-
scriptive right arises. This principle is thoroughly estab-
lished in this state. The latest expression of this court
upon that subject is *Northern California Power Co. Cons.* v.
*Flood*, 186 Cal. 301 [199 Pac. 315], wherein the court stated
as follows: "A right to the use of water for irrigation of
land may be acquired by prescription without showing that
the water is actually kept running upon the land all the
time. Irrigation, as usually practiced, is required only at
intervals during the season. If the claimant takes the water
and uses it at the time when it is necessary to do so and
does this under claim of right, without molestation by others
interested in the stream or ditch, and with their knowledge,
actual or implied, it will be sufficient with respect to the

continuity of use, *although there may be many days or weeks during which he does not use it at all.* The evidence leaves the question of the use of the water during the night-time uncertain, not showing clearly whether the continuous use spoken of was during the day only or both day and night for the entire irrigating season. The value of water for irrigation is too great in this state to allow a land owner to gain a right thereto for the entire twenty-four hours of each day by using the same for only a half or any other portion of the time less than the whole. If he has used it continuously for a certain period each day long enough to gain a prescriptive right to such use he would have the right only for that period and he could not lawfully object to the use by others of the flow during the intervening time of each day." (Italics ours.)

In one of our earlier cases (*American Co.* v. *Bradford,* 27 Cal. 360, 366) it is said: "The general and established doctrine is that an exclusive and uninterrupted enjoyment of water, *in any particular way,* for a period corresponding to the time limited by statute within which an action must be commenced for the recovery of the property or of the assumed right held and enjoyed adversely, becomes an adverse enjoyment sufficient to raise a presumption of title as against a right in any other person which might have been, but was not asserted. (3 Kent's Commentaries, 441–446; *Bealey* v. *Shaw,* 6 East, 214; *Shaw* v. *Crawford,* 10 Johns. 236; *John* v. *Stevens,* 3 Vt. 316; *Union Water Co.* v. *Crary,* 25 Cal. 504 [85 Am. Dec. 145].)" (Italics ours.)

In *Davis* v. *Gale,* 32 Cal. 26, 35 [91 Am. Dec. 554], the court said: "Although the plaintiffs may have had the prior right, yet if they or their grantors allowed the defendant to acquire and hold for five years adverse possession of the water which they had appropriated, *or any part thereof,* they, to that extent, lost their right by force of the statute. Upon this question, in *Union Water Co.* v. *Crary,* 25 Cal. 509 [85 Am. Dec. 145], we had occasion to say that 'The right of the first appropriator may be lost, in whole, or in some limited portions, by the adverse possession of another. And when such person has had the continued, uninterrupted and adverse enjoyment of the watercourse, *or of some certain portion of it,* during the period limited by the statute of limitations for entry upon lands, the law will presume a

grant of the right so held and enjoyed by him.' " (Italics ours.)

The decision in the case of *Santa Paula Water Works* v. *Peralta,* 113 Cal. 38, 44 [45 Pac. 168], furnishes an illustration of a case in which a right by an adverse user was obtained to use the water for certain days of the week only, during the balance of the week the water being returned to the stream and having been appropriated below. The prescriptive right obtained was commensurate with the use, namely, a certain amount of water for certain days in the week and an additional amount during the whole period as domestic water.

In *Smith* v. *O'Hara,* 43 Cal. 371, 376, it is said: "It is usually the case that the amount of water to which the several persons claiming its use are entitled is measured by inches, according to miner's measurement, or by the capacity of the ditches through which it is conducted from the stream, but there is no reason why the amount may not be measured in some other mode. They hold the amount appropriated by them respectively as they would do had the paramount proprietor granted to each the amount by him appropriated. The right to use the waters, or a certain portion of them, might be granted to one person for certain months, days, or parts of days, and to other persons for other specified times. An agriculturist might appropriate the waters of a stream for irrigation during the dry season, and a miner might appropriate them for his purposes during the remainder of the year. And so may several persons appropriate the waters for use during any different periods. There is no difference in principle between appropriations of waters, measured by time, and those measured by volume."

It is clear, then, that right may be gained to use water for certain periods of time as well as for certain amounts measured by volume or by flow, and that the measure of the prescriptive title is the use, under a claim of right adverse to all others for the period of five years. Consequently an interruption during the time that the Mill Creek waters were flowing in the Fitzhugh Creek was not necessarily an interruption of the adverse right asserted by defendants to the waters of Fitzhugh Creek.

As to the flood waters which continued to flow within the banks of Fitzhugh Creek, the plaintiffs, as riparian pro-

prietors, had a right to prevent an obstruction to such flow. The defendants, in order to divest this right of plaintiffs to such flood waters, must rely on grant from plaintiffs, or prescription against them, precisely the same as in the case of the ordinary flow of the stream. With respect to the annually recurring flood waters of said creek which do not remain within the banks of the channel which confines the stream in ordinary stages of flow, but which overflow and spread out beyond such banks and over the lands of the plaintiffs, it is conceded that the only benefit which plaintiffs do or can derive from them arises from the fact that it deposits silt which enriches the land. Whether or not the water so escaping from the stream remains a part thereof, subject to the riparian right, or ceases to be subject thereto and becomes the "vagrant water" referred to in *Miller & Lux* v. *Madera Canal Co.*, 155 Cal., on pages 64, 76, and 77 [22 L. R. A. (N. S.) 391, 99 Pac. 502] (see *Gray* v. *Reclamation Dist.*, 174 Cal. 647 [163 Pac. 1024] as to the effect of this case), is a question which is largely a question of fact, and as the court below made no findings relating to it, we express no opinion thereon. The findings do not show an intent to include such water in the scope of the decision. The general question is one which is becoming more and more important in this state, and requires careful consideration.

As to defendant Payne's claim to flood waters, it is sufficient to say that he made no separate or special claim thereto as such, and his rights therein depend upon his ability to establish adverse possession for five years of the quantity of water he claims. Gertrude French claims a portion of the flood waters only and is entitled to such proportion thereof as has been actually diverted by her and put to beneficial use and used adversely during the period of flood waters continuously and without interruption for a period of five years.

It appears from the record that the testimony was very conflicting as to the amount of water used by the defendants and running in their ditches. Some finding of the fact should be made on the next trial.

Judgment reversed.

Shaw, C. J., Sloane, J., Shurtleff, J., Lawlor, J., and Lennon, J., concurred.