[Civ. No. 5210.   Fourth Dist.   Feb. 17, 1956.]

MAUDE R. WARREN et al., Respondents, v. CRAFTON WATER COMPANY (a Corporation), Appellant.

Surr & Hellyer for Appellant.

Clayson, Stark & Rothrock for Respondents.

MUSSELL, J.—Defendant appeals from a judgment and decree quieting title in plaintiffs to 14.4 day-inches of water per month, at a rate not exceeding 2 miner's inches, from an outflow weir in a water system owned and operated by the defendant Crafton Water Company.

The facts are set forth in a settled statement on appeal filed herein.   Plaintiffs are the owners of the "Warren Ranch," described as parcel one in the complaint, consisting of approximately 18 acres, near Redlands in San Bernardino County. About 14 or 15 acres of the ranch are planted to an orange grove and the balance is improved with a large three-story house and is devoted to lawn, garden, driveways, walks,

outbuildings and other improvements. Plaintiffs also own the property described as parcel two in the complaint, which property is approximately one-fourth mile from the ranch house. A cistern, approximately 20 x 25 feet and 5 feet in depth, is located on this parcel and from it plaintiffs and their predecessors in interest have for many years obtained water for use on the acreage on parcel one not planted to oranges. It is the right to a continued use of the water obtained through the defendant's water system to the cistern that is in issue here.

The defendant is a mutual water company, authorized to serve water to its shareholders only and on a nonprofit basis. Its main reservoir (known as "Crafton Reservoir") is situated near plaintiffs' said cistern. The chief source of water supply to the Crafton reservoir is Mill Creek, from which the water is conducted by a pipe into the reservoir. The flow from this reservoir is controlled by gates and valves and near them is an outflow weir from which a 6-inch gravity pipe line leads to plaintiffs' cistern. This pipe is equipped with a slide gate by which the flow of water from the outflow weir into the cistern can be regulated or stopped. If the slide gate is not closed, the cistern is so situated that the level of the water therein will "float on" or be at the same level as the water in the weir, unless water is drawn from the cistern faster than it can flow through the gravity line. From the cistern a pipe line (described as the "delivery line") extends to the Warren ranch. The cistern is about 130 feet higher than the Warren ranch house, giving a water pressure at the ranch at 57 pounds per square inch.

In 1921 one Junnius Pierce purchased the Warren ranch and the cistern parcel and continued to own this property until 1933 when he sold it to H. L. Putnam and wife. Pierce testified that when he first owned the Warren ranch he took part of the water which was used for irrigating the grove from the zanja, which was an old-time ditch carrying water from Mill Creek, and until he entered into a contract with the city of Redlands, the remainder of water used on the Warren ranch for irrigating the grove was delivered under his stock of the Crafton Water Company. When the flow in the zanja became intermittent, he started suit against the city of Redlands which resulted in the contract with the city, dated March 18, 1930. After the execution of this contract and while Pierce owned the Warren ranch, the Crafton Water Company delivered water under the contract on behalf of

the city of Redlands for irrigation of the Warren ranch and the water was used for irrigating the orange grove thereon. While he owned the Warren ranch, assessments were levied upon his stock of the Crafton Water Company regardless of where the water delivered under that stock was used. During that period water from the cistern was delivered to the Warren ranch and was used in the house and for watering the garden and livestock and he received water from the cistern even when he was not irrigating. The supply of water from the cistern was interrupted only a few times and was virtually continuous, and as far as he knew, there was no deduction from deliveries under his Crafton water stock or under the contract for water which went into the cistern, but he usually did not use all the water available under his Crafton water stock or under the contract. He sold no shares of stock of the Crafton Water Company to the Putnams when he sold the ranch to them.

The contract with the city of Redlands was executed March 18, 1930, between the city as party of the first part and J. Pierce and wife as parties of the second part. It recited that second parties were then owners of the real property described in the complaint herein; that about 18 acres of said real property for many years past has been supplied with irrigation and domestic water taken from that certain stream known as Mill Creek Zanja, the taking of such water for irrigation and domestic purposes from said zanja having continued for a sufficient length of time with notice to the owners of water flowing in said zanja and adversely to their rights, so that second parties, through their predecessors in interest, have gained a certain prescriptive right sufficient that they are now at all times entitled to a certain proportion of the water flowing in said zanja; and said right has come to be and is now recognized by the owners of water rights in said Mill Creek Zanja, such right of second parties having been established as the right to daily take from the said zanja a certain proportion of the stream running therein, such proportion, it being mutually agreed, is the equivalent of a constant flow of 10 miner's inches of water (1 miner's inch being hereby defined as the one-fiftieth part of a cubic foot per second, constant flow), such quantity being sufficient to furnish all of the irrigation and domestic water required upon about 18 acres of the real property hereinbefore described. The agreement then recites that the city owned a certain number of hours of the flow of Mill Creek, which water right was chargeable with the irrigation and domestic

right of second parties; that the city and other owners who had been accustomed to take delivery of their water through the said Mill Creek Zanja desired to discontinue the use of the zanja as a delivery ditch and intended to divert the water through the irrigation system of the Crafton Water Company and through lines of the city and other parties; that it was necessary in order to make such diversion and to discontinue the use of the Mill Creek Zanja, for the city and other owners in Mill Creek Zanja (other than the Crafton Water Company, which company owns approximately one-half of the water and water rights in said Mill Creek Zanja) to make some settlement or adjustment with second parties in order that they might not be deprived of their water and water rights. Second parties relinquished and transferred all their rights to divert water from said zanja for irrigation and domestic purposes and the city agreed to perpetually deliver to second parties for their use for irrigation and domestic purposes, and without cost to second parties, a stream of water equivalent to 300 miner's inches of water for each 30-day period throughout each and every year thereafter occurring, subject to certain conditions thereinafter set forth in the agreement.

H. L. Putnam testified that he purchased the Warren ranch from Junnius Pierce in 1933 and with it the rights under the contract between Pierce and the city of Redlands; that he got no water stock with the ranch and never owned any stock of the Crafton Water Company; that he owned the Warren ranch until he sold it to James G. Warren on April 5, 1937; that while he owned the ranch he used water from the cistern only for the garden around the residence and on the ranch and used in the residence water supplied by the city of Redlands from a meter; that when he bought the ranch and for some years afterward, the Crafton Water Company was delivering through the pipe line on Third Avenue for the city of Redlands the water mentioned in said contract between Pierce and the city; that shortly after he bought the ranch, he had a conversation with John Reece, the zanjero of Crafton Water Company, in which conversation Reece asked if he (Putnam) wanted water to be delivered into the cistern and charged against the 300 day-inches to which Putnam was entitled, to which Putnam replied that he did; that Reece asked if it was satisfactory to calculate the cistern water at 15 day-inches per month and he (Putnam) said that it was satisfactory to do so; that so far as he knew this was done as long as he owned the property.

The record shows that Putnam sold the ranch to James G. Warren on April 5, 1937, and that it was owned by him until his death and thereafter by his widow and daughter, the plaintiffs herein.

Sylvester L. Bassett testified that he worked for James G. Warren beginning January 5, 1938, and until April 29, 1950; that until April of 1942 he worked on the ranch under Charles Blackwell; that after Blackwell left in 1942, he, Bassett, moved onto the ranch and "had full responsibility of everything that went on on the ranch"; that while he was working there the water for irrigating the orange grove came from the city of Redlands through a meter at the southeast corner of the ranch; that the water used in the residence area came from the cistern at the foot of the Crafton reservoir; that the pipe line from the cistern ran westerly and passed across the Finch property to the southeast corner of the residence area of the ranch; that water from the cistern was used while he worked on the ranch for irrigating lawns and shrubbery around the residence; that before 1942, he put a new roof on the cistern and in 1949 put new screens around it; that he also cleaned the weeds around the cistern and during the spring of each year repaired leaks in the pipe line; that during the time he was employed on the ranch there were interruptions in the flow of the water from the cistern, but such interruptions altogether were not for more than one week; that the first interruption was during the period from 1938 to 1942; that after he took over in 1942 there were probably two or three different times that the water was shut off; that on such occasions he would call up Reece, the zanjero of the Crafton Water Company, and ask what was wrong with the water and Reece would say, "I will have to go and see" and shortly thereafter the water would flow from the cistern to the Warren ranch again; that in 1944 or 1945 the water from the cistern had been turned off and he was instructed by the manager of the ranch to see if he "could find a share of Crafton water" for the Warrens to supply water to the cistern; that he had a conversation with Reece in which he asked Reece if he knew where he could buy a share of water from the Crafton Water Company for the Warrens; that Reece told him that he did not know where shares of the water company could be bought and said, "You better keep quiet in regard to that water . . . if my boss hears of it or knows about it . . . he would raise hell and he would get that water shut off mighty quick."

Mr. DesMazes testified that he had managed the Warren ranch since March, 1950; that after he started managing it, the flow of water was uninterrupted until after Mr. Bassett left the ranch; that in April, 1950, the flow of water through the delivery line was interrupted; that he went up to the outflow weir on April 29, 1950, and found the slide gate into the gravity line closed; that he opened the gate and the water flowed through the delivery line for a few days when again the gate was closed; that he again attempted to open the line on or about June 15, 1950; it was blocked with concrete.

John W. Reece, zanjero for the Crafton Water Company from 1929 to April 1, 1948, testified that when he went to work for the company he was given a list of lands to which water was to be delivered and that he delivered water to the Warren ranch, which was on the list, through the cistern and also delivered irrigation water through a water line on Third Avenue; that the company delivered the 300 inches specified in the said contract with the city to the Warren property both through the irrigation system and through the cistern with an arrangement made through the city of Redlands to make that delivery due to the fact that the city had no line to deliver it; that later the city put in a line down Third Avenue and delivered irrigation water to the property; that during the time the company was delivering the 300 inches of water for the city he had several conversations relative to the cistern water with Mr. Putnam, the then owner of the property; that they tried to calculate the amount of water that he used through the cistern and "take it from the 300 inches, the balance going on the grove for irrigation purposes" and that during this period the company each month submitted a statement to the city for delivery of water, including deliveries through the cistern, and was by the city repaid a like amount of water to that delivered; that from the time Putnam became the owner of the property until the city took over the delivery of the 300 inches, the deliveries which he made for the company to the Warren property, including water through the cistern and that used for irrigation, did not exceed in all 300 day-inches per month at any time; that when Pierce owned the property a deduction of 15 day-inches per month was made on account of the delivery of water into the cistern and that this deduction was made from the amount of water Pierce was entitled to receive; that very often Pierce used only part of the amount of water to which he was entitled under his stock in the company, or

the 300 inches; that while he was zanjero the entire water system of the company was shut down at least once a year for a period of one to six weeks in the winter and when the system was shut down, no water flowed into the cistern; that there were shorter periods when the cistern was shut down during the irrigation season when the company was short of water or when someone wanted it shut off.

Reece's version of the conversation with Bassett relative to the purchase of Crafton water stock was that Bassett wanted to know if he could buy some Crafton water stock; that he told Bassett that he knew of none then available; that Bassett said they needed domestic water through the cistern and water for the lawns. Reece stated he understood that Putnam was using city water; that Bassett said Putnam was using city water but it wasn't enough to cover the ground fast enough; that he had been using some from the cistern and that they would like to continue; that he told Bassett he had no water stock and consequently had no water; that Bassett then stated that was why he wanted the stock; that he, Reece, then said, "Well, you go ahead and use the water until such time as we can get you some . . . stock, but if Charley Paine (president of defendant water company) hears about it, he will raise the devil and you will have to shut it off"; that Bassett said "All right" and that he would leave it for Reece to try to locate some stock; that he, Reece, did not repeat this conversation to Paine and did not locate any stock for Bassett.

The trial court found, in part, that grove irrigation water was delivered to the Warren ranch pursuant to the contract with the city of Redlands and through its Third Street main; that there is a domestic line from the city, which line is connected to the Warren residence and to outlets serving some of the surrounding grounds; that domestic irrigation water for a portion of the grounds around the residence is furnished through the delivery line from the cistern on the cistern parcel, said cistern being filled through the gravity line from water in the defendant's outflow weir and that said domestic irrigation system is also available as a source of fire protection for the residence; that Warren acquired the Warren ranch in April, 1937, and for a period of years in excess of five thereafter, to wit, until the water company caused the gravity line to be cut off and closed by the installation therein of a concrete plug on or about June 15, 1950, did at such times as there was water flowing in the

outflow weir, continuously take and draw through said domestic irrigation lines from water in the company's outflow weir a quantity of 14.4 day-inches per month at a rate not exceeding 2 miner's inches; that said taking of water by Warren from the water company's said outflow system was continuous and uninterrupted as aforesaid during said period and at all times was open, notorious, adverse and hostile to the water company and under claim of right; that the water thereby diverted was put to beneficial use on the Warren ranch for purposes of irrigation, fire protection and other beneficial purposes. The court concluded that plaintiffs are the owners of a prescriptive water right to 14.4 day-inches of water per month from the outflow weir to be taken at a rate not to exceed 2 miner's inches from the outflow weir, and are entitled to a decree enjoining the defendant from interfering with such rights. A judgment and decree quieting title to plaintiffs and granting injunctive relief was entered and defendant water company appeals, contending (1) that a claim of right and adverse use necessary to prescription was not shown by the evidence; (2) that prescriptive rights do not apply to a controlled and intermittent flow of water in a distributing system; and (3) that any injunction should be no broader than the right decreed.

█ It is well settled law that to perfect a prescriptive water right the use of water must be: (1) actual, (2) open and notorious, (3) hostile and adverse to the original owner's title, (4) continuous and uninterrupted for the statutory period, and (5) under a claim of title in the claimant, and not by virtue of another right. (*Peck* v. *Howard,* 73 Cal. App.2d 308, 325 [167 P.2d 753].) In *Knight* v. *Cohen,* 7 Cal.App. 43, 47 [93 P. 396], it was held that adverse use is inconsistent with a license or permissive use; the occupation in order to constitute an adverse user must be based upon a claim of right. This claim may be made by acts alone quite as effectively as by the use of words either oral or written. And in *Anaheim Union Water Co.* v. *Ashcroft,* 153 Cal. 152, 160 [94 P. 613], it was held that an express declaration of a right was not essential where there was satisfactory proof of a continuous, open, notorious and uninterrupted use of the water on the lands of the defendants for the statutory period, of such character as unquestionably to indicate that the use was being exercised in hostility to the right of any person to interfere with its exercise. In *Chapman* v. *Sky L'Onda Mut. Water Co.,* 69 Cal.App.2d 667,

678 [159 P.2d 988], it was held that when one who claims an easement by prescription offers satisfactory evidence that all the required elements exist, the burden of showing that the use was merely permissive shifts to the owner of the land and where the claimant shows exclusive, open and notorious possession, and acts evidencing domination and control throughout the statutory period, the inference arises that the use was adverse and under a claim of right.

In the case at bar the record clearly shows that water was supplied by the defendant Crafton Water Company to the Warren ranch through the cistern for many years. The city of Redlands recognized the prescriptive right of Pierce and his wife to the taking of water from the Mill Creek Zanja for irrigation and domestic use upon the Warren ranch and in return for relinquishment of such rights, the city agreed to deliver to the ranch at the high point on the east line thereof, or at such other point as agreed upon, a stream of water equivalent to 300 miner's inches of water for each 30-day period throughout each and every year thereafter for use for irrigation and domestic purposes and under certain conditions and reservations. The defendant company under an arrangement with the city delivered this water both for irrigation on the orange grove and for use on the residential area of the ranch through the cistern owned by plaintiffs' predecessors in interest. When Pierce sold the property to the Putnams in 1933, the delivery of water through the cistern was continued as before. Putnam acquired the rights of Pierce under the contract with the city and it appears that the water delivered through the cistern was calculated at 15 day-inches per month and charged against the 300 miner's inches specified in the city's contract. There is no indication in the record that Putnam's right to have the water delivered through the cistern was challenged by the defendant company. After Warren acquired the property in 1937, the defendant water company continued to deliver water through the cistern under the contract between the city and Pierce without objection, thereby recognizing the claim of plaintiffs and their predecessors in interest to a continuance of delivery of such water through the outflow weir and cistern to the Warren ranch.

Bassett, the ranch manager, testified that during the time he was employed on the ranch (January 5, 1938-April 29, 1950) there were interruptions in the flow of water from the cistern but such interruptions were not for more than

one week altogether; that when the water was shut off, he would call up the zanjero and ask what was wrong with the water and the zanjero would go and release the water into the cistern.  The record shows that interruptions to the flow of such water were objected to by the Warrens and in each instance the water supply was resumed.  Bassett and his helper repaired the cistern, cut the weeds around it each spring and repaired leaks in the pipe line.  It is evident that the use of the water through the weir and cistern was open and notorious for many years, and there is substantial evidence to support the finding that such use was under claim of right.

Appellant contends that the offer made by the Warrens through Bassett to purchase a water right for the cistern by buying a share of the company's stock was a perfect answer to Warren's claim of prescription and that the conversation between Bassett and Reece showed that the use of such water was permissive rather than adverse and under claim of right. However, the record does not show that the company, through its officers, ever disputed the right of the Warrens to take delivery of the water through the cistern, at least until the pipe was permanently closed by cement plug in April, 1950. The conversation between Bassett and Reece took place around 1944-1945, long after the Warrens acquired the property and after they had used the water through the cistern for more than five years without discussing the matter with anyone other than to complain about interruptions in service and to have such service restored.  The evidence as to the inquiry by Bassett in regard to the purchase of water stock reasonably supports the inference that the Warrens did not thereby intend to relinquish their rights in the cistern water.  Bassett testified that he was instructed by the ranch manager to see if he could "find a share of Crafton water" for the Warrens to supply the cistern.  Such an instruction is not an offer to buy.  Reece testified that he said to Bassett, "Well, you go ahead and use the water until such time as we can get you some . . . stock, but if Charley Paine hears about it, he will raise the devil and we will have to shut it off."  This statement, if made, indicates that Reece was not representing the company at the time and that he had no authority to make such a statement.  He testified that he did not repeat the conversation to the president of the company and there is no indication in the record that any of its officers knew of it.

Appellant contends that the water here involved is water

of the Crafton Water Company, flowing in the channels of the company, namely, its pipes and weir box, and is personal property en route to delivery to the company's shareholders; that even though the company may have permitted certain of such water to flow out of its boxes into the cistern, such flow could not and did not give birth to any right of Warren to have the flow continued and that not only is the claimed prescriptive right precluded from arising by reason of the character of the system, but also because the flow was always controlled and was interrupted at least annually. However, there is substantial evidence to support the court's finding that the plaintiffs acquired a prescriptive right to water flowing through defendant's outflow weir and into the cistern and that the taking of such water was open, notorious and adverse to the water company and under a claim of right. The evidence shows that there were interruptions in the flow of water through the company's system during the winter and water from the cistern was not used during the rainy season of approximately two months each year. ■ However, in *Armstrong* v. *Payne,* 188 Cal. 585 [206 P. 638], it was held that in considering the effect of interruptions relied upon to break the continuity of use essential to establish title by prescription, it should also be noted that the use does not have to be of a continuous flow in order to establish a prescriptive right; that the adverse claimant may establish a right to use water intermittently and for part of the season; that if that right is insisted upon and maintained without interruption, a corresponding prescriptive right arises. And on page 593 it is said that " 'In order to support an easement by prescription, the adverse use must be continuous . . . An occasional suspension or interruption of the enjoyment will not defeat the right, if it arises from such causes as the dryness of the season; a temporary failure to exercise the right to the extent claimed; or fluctuations in the flow of the stream.' "

Finally, it is argued that the injunction as to the defendant water company is too broad in its provisions; that with the company's system of delivery of water to its shareholders in heads, if Warren at pleasure could take the full 14.4 day-inches of water in one day and reduce the head set for a particular shareholder to that extent, it would work a greater hardship on the company and its shareholders than if the same quantity were taken by Warren at the 2-inch rate of flow specified for it in the judgment. However, the judgment

provides that nothing therein contained shall be deemed to prevent the water company from in good faith making such adjustments, corrections or alterations in the flow of water through said outflow weir or outflow system as good business and operating practice may require; that nothing in the injunction shall be construed to require the water company to divert or store in the Crafton reservoir any quantity of water solely for the purpose of making the same available to Warren nor shall it be construed to require the water company in the event said water shall not be stored by it in the Crafton reservoir to maintain a constant flow therefrom through the outflow system or more particularly to the outflow weir. The evidence shows that in the normal operation of the cistern its level was allowed to "float" on the level in the weir by means of the larger 6-inch gravity line. The provision in paragraph 4(b) of the judgment which reads "From in any way, manner or form closing or restricting the gravity line" is modified by adding thereto the words "in such a manner as to interfere with plaintiffs' right to 14.4 day-inches of water per month through said gravity line at a rate not exceeding two miner's inches."

The judgment as so modified is affirmed. Respondents to recover costs on appeal.

Barnard, P. J., and Griffin, J., concurred.